Case number 21-3389, Eastern Missouri, Flor Corporation versus Zurich American Insurance Company. All right, Mr. Martinez, we'll hear from you first. Good morning, your honors, and may it please the court. The parties in this case vehemently dispute as a factual matter whether Zurich acted in bad faith by rejecting a $7 million settlement opportunity that would have saved Flor from losing $300 million at trial. Despite this dispute, the district court granted summary judgment to Zurich because it believed Flor's policy limits had already been exhausted as a matter of law at the time of Zurich's misconduct. That ruling was wrong for three reasons, each of which independently requires reversal. First, the plain text of the policies established per claim limits, not per occurrence limits. Second, the lawsuits against Flor triggered more than one occurrence under the policies. And third, the advantage case makes clear that Zurich can't rely on the policy limits to avoid bad faith liability because Zurich never informed Flor that the limits were exhausted at the relevant time in 2010. To win this appeal, Zurich needs to run the table on each of those three arguments, but it can't do that. On the first two arguments, it needs to show that it's one occurrence exhaustion theory is unambiguously right, and that Flor's multiple occurrence theory is not just wrong, but also unreasonable. But the text here supports us, and Zurich's conduct for nearly 15 years, including throughout this case until the eve of trial, is flatly inconsistent with their late-breaking single occurrence theory. If that theory was unambiguously right, Zurich surely would have raised it more than eight weeks before trial, five years into this case. I'd like to start by diving into the per claim limits issue, which turns on the plain language of endorsement seven to the 1981 and 1982 policies. And for the court's ease of reference, we've reproduced that language on page seven of our brief. And I think it's worth looking at the language closely and looking at how the formatting and the structure appears right on that page. The straightforward question of textual interpretation presented here is whether the as respects incidental professional liability clause at the end of the second indented subpart reaches up and back to modify the each claim phrase in the first indented subpart. And the answer to that is no. The language as respects incidental professional liability, which appears only in the second indented subpart, only modifies the things in that second indented subpart. We know that because there's a standard canon of construction, the indentations canon, which Justice Scalia and Brian Garner talk about in their treaties. And what the treatise teaches us is that in contracts and in other legal texts, and here I'm quoting, quote, material contained within an indented subpart relates only to that subpart. Whereas material contained in unindented text relates to all of the following or preceding indented subparts. The whole purpose of using indentations when you're writing a legal text like a contract is to provide exactly this kind of clarity between how different causes and provisions interrelate with one another. And these kinds of meaningful indentations appear not just in endorsement seven, but throughout the entire contract. I think the best place to look would be on page A209, the limits of liability provision. There are 14 different places on that page where the parties used meaningful indentations to provide clarity on exactly what coverage and what limits of liability were being established. Each one of those uses of indentations is consistent with what Scalia and Garner say, it's consistent with our theory of the indentations, and it's inconsistent with Zurich's theory. Just quickly, there are a couple other textual clues. I think the indentations really do the bulk of the work for us, and they're dispositive. But even if you didn't have the indentations, we would also have the last antecedent rule, which under its standard formulation by the Supreme Court says that the limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows. Now the other side says that the normal rule is that the last antecedent rule is trumped by a different canon, the series qualifier canon. And so on page 50 of their brief, if they cite the Lloyd case for the proposition, this is how they describe Lloyd, the series qualifier canon, quote, ordinarily trumps the rule of last antecedent. But that gets Lloyd exactly backwards. Lloyd actually says the exact opposite. Judge Collett, in your opinion, and Lloyd said that the last antecedent rule is the one that presumptively applies, and the series qualifier canon trumps it only when there's no reason consistent with any discernible purpose of the statute, or here a contract, to apply the limiting phrase to the last antecedent alone. Here, the purpose is clear and discernible, as I mentioned through the indentations, and it's a perfectly natural thing to do to change the per-occurrence limits that had been established by the declarations page and to change those to per-claim. We also think there's language in the provision that's superfluous on their reading as well. Now, we think that that language is absolutely clear. If you have any questions about that or any doubts about that, I think the next canon to turn to would be the contra-preferentum rule, which Missouri has embraced, especially strongly in the insurance contract. And the Missouri rule is that ambiguities in a policy must be resolved in favor of the insured. That's the Burns case. That's the general rule. But Missouri actually has a corollary to that rule that addresses exactly the situation we're talking about here. That's the Niswonger case that we cite at page six of our reply brief. And what Niswonger is doing is it's addressing a situation where the interpretive question is what phrase a clause modifies. And Niswonger says, and here I'm quoting again, if the position or sequence of a clause in an insurance policy creates a question concerning which preceding phrase or phrases it modifies, the choice is to be made in favor of the insured. That language from Niswonger describes this case to a T. So what does the other side say about these points on per-claim? Council, before you move on, I just have a practical question, which is what is, or how would it apply in this particular case, the incidental professional liability endorsement? What kind of claim would come about when you're talking about a lead smelter facility? I'm trying to figure out what the meaning of that provision is. Yeah, I think if you had a claim, if you had a medical malpractice type of claim, I think that kind of professional liability could trigger that kind of coverage. Would that practically happen at a lead smelter facility? I mean, were there? I'm just trying to figure out whether that even applies in this case. I know it's written that way, but I'm just trying to figure out. I think it's a general type of coverage that parties often include to cover those types of situations and you can imagine all sorts of, just in case, exactly. And I think it's worth looking at the language of the incidental professional liability limit because I think when the other side addresses our per-claim argument, they make a couple of points about that. And I think their primary argument, their overarching argument seems to be that the endorsements establishing the incidental professional liability, that's endorsement 11 in the 1981 contract, what they say is that, look, this is the provision that established incidental professional liability. It contains no limits of liability at all. Therefore, it makes sense to read endorsement seven as sort of filling that slot and providing the limits of liability that otherwise would not exist. That's their primary argument. The problem with that argument is that it's just not right. If you look at endorsement 11, I think it's at page 8227 of the appendix, and endorsement 25A, they actually have language that expressly establishes limits of liability. And those endorsements say that the total liability as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to each occurrence. So they tell you that the limits of liability are taken from the declarations page. They kind of cross-reference the declarations page. And that's perfectly consistent with our theory because our theory is that endorsement seven amends or changes what appears on the declarations page. So I think that that's their primary theory on this per claim thing. We think that's wrong. The other point that they make is that there are some inconsistencies that arise if you read the endorsement to actually establish per claim liability. And it's true that there are a couple of inconsistencies, but that's the whole purpose of an endorsement. The reason you need an endorsement is because you want to change the rules that would otherwise apply if the endorsement didn't exist. You're making a change. So the whole idea here is that it's gonna be inconsistent. And the Missouri cases we've cited throughout our brief, especially at pages 10 to 11 of the reply in footnote two, make clear that under Missouri law, endorsements, quote, supplant, supplant, conflicting policy provisions and prevail when there's a conflict. So even if there is some inconsistency between endorsement seven and a couple of other provisions, that doesn't matter because endorsement seven trumps. I would also say, though, and here it starts to get a little bit into the weeds, but their argument that our interpretation is inconsistent with the limits of liability clause doesn't work for them either because they have the same inconsistency problem that they accuse us of having. Their theory of this contract is that there are per claim limits set up for incidental professional liability. We think it's per claim for everything. But when you look at their theory of endorsement seven as applying a per claim rule for incidental professional liability, there's still a conflict because the incidental professional liability language that I just read to you from endorsement 11 uses per occurrence language. In fact, it's the identical language, so essentially cut and pasted, from the limits of liability clause that applies to the rest of the contract. So to the extent that they're saying that our argument is inconsistent with the limits of liability clause, they have precisely the same inconsistency problem with their own theory. Suppose that the language as reflects incidental professional liability endorsement were not indented and that it came at the end, kind of like the end of a block quote or whatever, so that it was clear that it applied to both. So it's 500,000 each claim, 500,000 each aggregate. Would that convert, at least for the professional liability endorsement, that would that convert it because the limits are the same into a per occurrence? Or would it still be a per claim under Missouri law? I think if you concluded that endorsements, if it were written differently and if you concluded that the as respects incidental professional liability as unindented, modified, or applied to both, then I think it would still be a per claim policy with respect to incidental professional liability because the language of the endorsement would still say 500,000 each claim. Okay. I'd like to turn just briefly, I'm happy to answer more questions on the per claim issue. We think that that issue is the most simple and straightforward and textual basis to resolve this case. It's also a case specific basis. It really turns on this particular contract. The other two arguments that we make against the grant of summary judgment to Zurich have much broader and more significant implications. I'd like to just turn very briefly to them. If you somehow concluded that this was in fact a per occurrence policy, not a per claim policy, we should still get reversal here because it's just not the case that there was one occurrence. I mean, we have a smelter that's been operating for over a century, allegedly spewing out harmful materials into the air. Only an insurance company would say that all of that lead that was put out in the air, however it got into the air, into the water, into the land, however it infected or hurt different people over the course of decades, maybe even a century, they would say, all of that's just one occurrence. That's just not a reasonable interpretation of the contract. It's inconsistent with how courts across the country have looked at long tail mass tort environmental claims. There's no precedent for it. I mean, we cite nine mass tort asbestos or harmful toxin cases, recognizing multiple occurrences in these circumstances, including most relevant here, the Doe Run case. They cite zero. They rely on cases involving a drowning or a car crash. Just to give a hypothetical, if the smelter had been running for 50 years and Andy breathes lead that was sent out through the air in 1950 in Clayton, Missouri, and John is hurt by lead because he drinks water 50 years later, 15 miles away, under Zurich's theory, that would be one exposure and one occurrence. That can't possibly be correct. It's also inconsistent, of course, with Zurich's conduct throughout the last 15 years, essentially up until the eve of trial. The Zurich, going back to 2008 and 2009, treated this situation here as involving more than one occurrence. They paid settlements in 2008 and 2009 that only made sense if there were multiple occurrences. In December 2010, they did an internal coverage analysis that recognized that each plaintiff was a different occurrence for 21 different plaintiffs. In 2011, they did a coverage analysis that's at Exhibit 5, record entry 689. They did an eight-page single-space coverage analysis that identified five different causes, which they said, as later reflected in a chart that appears at Exhibit 7, reflected 14 different occurrences. In 2012, they reached a settlement with Doe Run, and the language of the settlement expressly says, the parties have determined there are five occurrences with respect to the Herculaneum claims. And it said that, therefore, the policies were exhausted, i.e., therefore, in 2012, as a result of that settlement. And then, even when they filed this case, even in their own complaint at page A114, they make the assertion, they ask for a declaratory judgment that the policies here were exhausted by the 2012 settlement, which means that they had not already been exhausted at the time of the misconduct in 2010. So, for all these reasons, the one occurrence theory that the other side has put forward and that they prevailed on cannot possibly be correct. We don't think you need to reach that because we think the right answer is that we went on the per-claim arguments that I've already made. But if you do reach that, we should prevail on that ground. Question about that. So, what do you do with the policy language that says, all bodily injury, and, of course, the other side, dot, dot, dot, arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence. That seems to be a pretty strong statement that if you have one single stream, continuous stream of pollution, and it harms somebody, that that's one occurrence. Your Honor, that's standard language. It's called the Deamer Clause. That's standard language that appears in insurance contracts across the country. And whenever it appears, courts interpret that as essentially treating as one occurrence one single person's repeated exposure to toxins or harm. It does not allow you to aggregate different people and put them together. And so, that really is intended to unify, sort of, if you or I are exposed to toxins over a course of years, that would be maybe one occurrence if we're all exposed to it in exactly the same way. But we would not aggregate across the two of us. You would have an occurrence, I'd have an occurrence. And if you need confirmation of that, you can just look at the five cases that we've cited in our brief that interpret this exact same Deamer Clause language. The plastics case, the Pella case, and three cases we cite at page 15 of our reply brief, all of them interpret the Deamer Clause our way. They don't have a single case interpreted their way. So that's true even if, to sort of use an extreme example the other way, we live in the same apartment complex, you and I, and it so happens the exact same pollution. We can trace it to the exact same release of a pollutant, and we both end up getting sick from that same release. Right, I think the Deamer Clause would not affect that scenario. I think there would be other arguments that if we had the exact same multiple, if we had the exact same contamination pathway, lead is expelled into the air from a smelter, it lands in the water, we both drink the water at the exact same time. I think there might be an argument there that that would be the same contamination pathway, so it'd be one occurrence for that reason. But it wouldn't be because of the Deamer Clause. The Deamer Clause is really intended to unify on an individual by individual basis. I'm a little bit into my rebuttal time. I just want to highlight one additional issue. I'm happy to answer questions on it, which is that if you agree with us with respect to the policy limits issue, then we would need to go back and have a trial on the bad faith claim. And so that's sort of the, we have three arguments for that. That's sort of the main bulk of the briefing. We also raised a different argument, which is that we were denied summary judgment with respect to the first two elements of the bad faith failure to settle claim. We think that under a very straightforward reading of the Scottsdale case, we think that was erroneous. We think that that issue is properly before you, and we think that you should reach it because it could, as a practical matter, it could make a big difference if the case goes back. The way that the district judge seemed to be thinking about this case is that a jury could find that because of something, the way that the negotiations were conducted, if Zurich wasn't playing an active enough role in the negotiations, even though they reserved the right to block us from settling, that that might be a basis for us to lose, even if they acted with bad faith. We don't think that's right. We think that if this were to go back, it could confuse the jury, it could lead to the need for another appeal. If we lose on that basis, we just think you should look at that issue and resolve it. Unless there are further questions, I'd like to reserve the balance of my time for rebuttal. You may, thank you for your argument. Thank you, your honors. Mr. Safer, we'll hear from you. Good morning. Good morning, your honors. May it please the court, Ron Safer on behalf of Zurich.     what the purpose of this hearing is. What you just heard was a hyper-technical discussion of the limits, ignoring what this court and what the Missouri courts have repeatedly said is what the courts must do in interpreting contracts, including insurance contracts, which is to look at the contract as a whole and give meaning to the party's intent. None of that was discussed for 17 minutes. Missouri courts have repeatedly held that an ambiguity only arises if you have two competing or more reasonable interpretations of the contract. This court has recognized that in Brazil. Missouri law says that a reading of the policy that neutralizes other provisions of the contract is unreasonable. And that is what floor asked this court to adopt today. It asked this court to ignore key provisions of the policy and rewrite others based on indentations or punctuation, actually ignoring lack of punctuation in an endorsement that addresses a completely unrelated coverage. And your honor, I think incidental professional liability is so somebody at the smelter is injured and they're treated by a doctor or their healthcare provider at the facility. That's the kind of claim this would cover. Completely unrelated to this claim, Florence reading of the contract that endorsement seven changes the limits of liability from bodily injury to each person's claim as opposed to each occurrence would require that you strike the very first words of the limits of liability provision of the contract that says, quote, regardless of the number of persons or organizations who sustain bodily injury or property damage or claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows. They would have to read the explanation that was just given to you about the Deamer Clause is contradicted directly, your honor, by that language in the limits of liability. Why is that a problem though? I mean, I have had a lot of cases over the years dealing with endorsements that essentially change earlier statements in the policy itself. That's in fact what endorsements do for special cases. You know, two parties, you know, they contract and they negotiate for it. So why is that a problem here? Well, it's a problem here, your honor, because in the first instance, this endorsement was provided, was done with the policy. It's not a later provided term. And that is critically important. Floor argues for the first time in reply, they say, well, yeah, there's contradictions, which is fatal to their agreement, unless it's a later issued endorsement that does two things. And this is not a later issued endorsement. This is issued with the policy. And the endorsement expressly sets out that it contradicts language. Unless those two things are present, then the endorsement does not change the language, your honor. First, this endorsement was not issued after the policy. It was issued with the policy. And then it would be nonsensical for it to contradict the terms, unlike the typical endorsement that your honor is describing. All endorsements that were written after the policy are dated with a date stamp on the endorsement. Appendix 203, floor is appendix 203, additional named insured. Appendix 211, joint venture endorsement. And appendix 212, additional named insured. Appendix 224, revised endorsement 10. Appendix 228, endorsement 12. 229, endorsement 13, which is an amendment to endorsement 11, which was issued with the policy. Endorsement 13 amends that after the policy. Thus, endorsement seven, and that makes perfect sense, your honor. Because endorsements seven and 11 were not issued to change anything. They were issued to provide missing terms. If you look at the declaration page, which is at appendix 196, you see the structure makes that very clear. You have boxes for occurrences, for general liability, for the limits, the number of limits. You have boxes for contractual liability. But then down below, you have incidental professional liability. And for that, the declaration page does not provide a monetary limit box, but says, refer to the following designated coverage parts for coverages, that's endorsement 11, and limits of liability afforded there under, that's endorsement seven. It is issued with the policy, your honor, and thus, the conflict is fatal. It's not like a typical endorsement that changes things. So if you have a situation, and I've seen these before, where the endorsements come at the date of the policy. I have endorsements that come on the date of the policy for things like, in my homeowners, for things like flood insurance or mold remediation. So you're saying to the extent those conflict with anything earlier in the policy, they're just invalid. If they, no, your honor, if they clearly, what the Swift case holds, is that, and that's the Missouri Supreme Court, that endorsements do not limit it or change the basic policy, except as specifically set out in the endorsement. So those endorsements would undoubtedly say, this provision overrides X, or this provision changes Y. In that case, as the Missouri Supreme Court has said, then you have an amendment, and that's not a problem. But you have a change, and that's not a problem. But here, that is not so. And indeed, the two cases that floor sites, both Union Electric and Aptco Tank, both contain express provisions indicating an intention to conflict with and prevail over. In Union Electric, quote, notwithstanding anything contained in this policy to the contrary, close quote. In Aptco Tank, quote, this endorsement modifies such insurance as is afforded by, and then it goes on to explain. That's where you have the conflict. But they cannot be read, an endorsement that does not have that. And by the way, in this very contract, there are those examples. In endorsement 12, you have that language that says that named insured is amended to include in endorsement 13, appendix 229. It says it is agreed that the incidental professional liability endorsement is amended to read, and then it provides a change provision. That's what you have. You do not have that in endorsement seven. Now, they say that, well, endorsement 11 provides, that endorsement 11 provides coverage limits, and it does not, Your Honor. It is very clear. It does not contain limits of liability. Again, an argument made for the first time in their reply brief. The language Floor cites is nothing more than a portion of the limits of liability section of the insuring agreement. It no more provides monetary limits than the limits of liability provision does for any other coverage. Floor's reading of the endorsement for all coverages does violence to the declaration page. And in order to make this argument at all, they have to misquote the provisions in endorsement 11 and mischaracterize the declaration page. Indeed, the language is clear, and the language, and I will return to that language that they omit in endorsement 11 to explain what, why it references occurrences in one moment. But if you look at Floor's appendix 347, 374 through 79, it contains the incidental liability endorsement for the 1983 policy. And in that policy, endorsement 14, they combined endorsement 11 and endorsement seven. And you will see that the first four pages of that are the former endorsement 11. And that includes the language that they now say in their reply brief, provides monetary limits. Page five of that endorsement is endorsement seven. And that is the monetary limits. If endorsement 11 had provided the monetary limits, this page would not be necessary, would be absent from endorsement 14 in the 1983 policy. Matt. Question, you know, the indentation slash subpart canon is a thing, and it's been a thing for a long time. And it appears that that limitation on professional liability insurance  So did your client make a mistake by putting it in the same, in the same, and ignoring that particular canon? Now, canons are not absolute as we know, but it's a thing and it's something your client should have known about. It is a thing, Your Honor. And first of all, I think that as Your Honor points out, they do not trump everything. And the first thing that the court should do is look at the contract and enforce the parties intent. But to address the important question that you asked, these are not subparts, Your Honor. This is very different. In fact, it's very different than the situation Your Honor wrote about in Lloyd. This canon is inapplicable because the two phrases are not subparts. This canon depends on the existence of subparts. The JAMA case cited by Floor makes this clear in its discussion, where the court notes that each clause is distinct and ends with a period, strongly suggesting that each may be understood completely without reading any further. That punctuation is missing from this. And as the Gardner and Scalia book says in this case, the same result should have applied even if the periods had been semicolons. But it doesn't say that the same result should have been reached if there was no punctuation. Here, there are neither periods nor semicolons, simply one interrupted sentence, with no subparts marked out by punctuation, strongly suggesting that any phrase can be understood only by reading further. No subparts, no scope of subparts canon. Perhaps more importantly, Your Honor, focusing solely on punctuation in endorsement seven violates this directive to read the policy as a whole. So what their argument is that because of an indentation, Your Honor should totally eviscerate what was an occurrence, clearly, an occurrence-based policy and change it to a claims policy. Your Honor should totally read out the limits of liability section that says, regardless of the number of persons, regardless of the number of claims, and instead say, because there's an indentation, that sub silencio, that endorsement for completely unrelated coverage, reads out everything else. Totally changes the character of this, and that is just wrong. Opposing counsel makes the point that Zurich's own actions sort of are suggestive of the fact that maybe Zurich was unsure about the limits of liability, that it took a while for Zurich to actually assert this. I just want to give you a chance to respond to that. Thank you, Your Honor. I appreciate that. First of all, the only thing that wasn't raised throughout this litigation is endorsement seven, by the way. This litigation had been going on for a decade, and if you search the entire record, endorsement seven was never mentioned by anybody. So if endorsement seven rewrote the contract, it would have been front and center. It was not. Zurich raised this every time. Every settlement check that Zurich provided on behalf of Doe Run and Floor included an express reservation of rights saying, quote, Zurich reserves the right to seek a determination that only a one occurrence policy limit is available for these claims based upon provision in the Zurich policies and applicable law. No one said in response to that, oh, no. This is not a one occurrence policy. Look at endorsement seven. No one said, oh, there are as many occurrences as claimants. When Doe Run settled the case and Floor came on the scene, Zurich expressly wrote this in 2011, before they went to trial, expressly wrote to Floor and informed it that Zurich believed that this was a one occurrence policy and that the limits of those policies had been exhausted in the March 18, 2011 letter in advance of the mediation. It says that the letter expressly talks about exhaustion. It notes the definition of occurrence. It notes that there was one occurrence, quote, the same general conditions of the herculaneum smelter operations, the same language that Your Honor referred to. And it goes on to expressly tell Floor that the policies are exhausted. Quote, Doe Run has agreed that the 1983-84 Zurich policy was exhausted through a settlement. Additionally, the 1980-82 and 84-85 Zurich policies have paid out an occurrence limit, each for the settlement of the prior herculaneum lawsuits. Based on the foregoing, the occurrence limit for each of these settlements of the policies would no longer be available to assist in settling reference litigation. Going back to the policy, you said you wanted to come back to endorsement 11 and make one more point. Yes, thank you, Your Honor. Would you finish that? So why does endorsement 11 refer to occurrences? It doesn't provide a monetary limit. So why is the occurrence language there? It is there because it provides a limit. There is a limit. So if you had, for example, a doctor or a dentist who used a bad drug repeatedly on any number of persons, or a drug that was found to be effective, that would be a single occurrence. And that would be a limit. And if the individual claims, because in incidental professional liability policy is by claim as opposed to bodily injury, then the occurrence provision provides a limit for that. That's why endorsement 11 contains the occurrence language as well. It does not alter the nature of this policy. And that is very important. With regard to the contra preferendum, again, of course, that this court, that presumes that an insured, that there are two reasonable readings of this policy, and there are not. But as this court found in Burns, when there is an ambiguity, insureds are entitled to a resolution of that ambiguity consistent with their objective and reasonable expectations as to what coverage would be provided. And that approach was affirmed by this court in Mendota and Brazil. Insured is not entitled to prevail and have its interpretation of the policy language enforced when it does violence to multiple material clauses, as Floor now admits it does. It admits that there are conflicts. And that is critical. Now, with regard to the number of occurrences, Floor has waived that argument. Floor did not argue below that there was some number of occurrences less than every person. They did not raise that argument. And they have waived that argument. They argued below that each claimant was an occurrence. Nor did Floor do anything to develop the record on this issue. Yes, there were analyses that analyzed the worst case scenarios for Zurich. But it is equally important to note that Zurich informed Floor, as I just read, that it was a single occurrence. That's what they believe. Not that the worst case analysis from counsel, but rather, they informed them that there was a single occurrence based. Every settlement check said that. The letter in advance said that. Finally, with regard to the summary judgment issue, I want to make clear. First of all, Floor completely controlled this defense. They had independent counsel. Zurich was not even allowed to speak to Floor's counsel unless insurance coverage counsel was on the phone as well. Zurich was barred from attending mediations for years. They had no control over these policies. And they concealed nothing. Floor knew that there was an opportunity to settle for cheaply, quote, for millions of dollars, quote. And they chose to go to trial because they said not everyone cares as much about lead as Doe Run does. They were wrong. They miscalculated their risk. That's why they went to trial, not because Zurich concealed anything. Thank you. Very well. Thank you for your argument. Thank you. All right, we'll hear rebuttal. Thank you, Your Honors. Just a few points. First of all, there's nothing hyper-technical or inappropriate for us to rely on the plain language of the contract invoking standard canons of construction that the other side concedes are real life canons of construction. I heard the other side essentially concede that there was a mistake in the way that they drafted this agreement because they should have done the indentation differently. We think that the plain language, as the contract was actually negotiated, drafted, and agreed, governs here. Even if you think there was some sort of mistake or confusion, at most that gets them to ambiguity. And we win under ambiguity. My friend on the other side relied heavily on this alleged conflict between our proclaimed theory and the limits of liability language on page 209 of the appendix. I don't have time to walk through in great detail, but I just want to emphasize the exact same limits of liability language on 209 that they say creates a conflict for our proclaimed theory creates the exact same conflict for their proclaimed theory. Because that language from page 209 that they're relying on appears in endorsement 11. The endorsement that they say establishes incidental professional liability insurance. So the exact same inconsistency argument that they accuse our interpretation of creating also applies to their theory. Just to stress, you're exactly right. The timing of the endorsement doesn't matter. It's often the case in insurance contracts, and it's almost always the case that endorsements are included along with a form contract at the time  And that's because these contracts tend to be forms. They're not drafted from the ground up every single time. And because they're forms, you add the endorsement at the same time to clarify or change the form, and then the contract as a whole is a whole. Counsel is right in the sense that usually it says we are superseding this provision, this section of this provision. You have that language here at the beginning of the endorsement, but it's not precise. Well, we think it is precise, Your Honor, because I think that the language at the beginning of the endorsement specifically says, this is the umbrella language at the top. It says, it is agreed that with respect to limits of liability for comprehensive general liability as designated under item three of the policy declarations is amended. So that directly tells you this endorsement is going to amend what I just read, and it tells you the exact thing we're amending, and then it says here's how we're going to amend it. And so they say, OK, well, fine, endorsements can be simultaneous, but only if they're specific. And here we have a specific reference to the thing that's being amended. So I don't think that argument works for them, either. They said. Very well. Thank you, Your Honor. Your time's expired. Thank you for your argument. Thank you, Your Honors. The case is submitted. Thank you to both counsel. The court will take it under advisement and file a decision in due course.